WRIGHT v RINALDO

Docket No. 275518. Submitted January 9, 2008, at Detroit. Decided July 10, 2008, at 9:00 a.m.

Rickie J. Wright brought a legal-malpractice action in the Oakland Circuit Court against Amy Rinaldo and her former law firm, Kohn & Associates, P.L.L.C., related to Rinaldo's prosecution of an application to amend and reissue his patent. While Rinaldo was representing Wright, he was consulting other attorneys on various matters that included his patent application, and he ultimately revoked the power of attorney that allowed Rinaldo to represent him before the United States Patent and Trademark Office. The court, Colleen A. O'Brien, J., granted the defendants summary disposition, concluding that the attorney-client relationship had ended on December 18, 2003, which was more than two years before Wright filed his complaint, and that the statute of limitations for malpractice therefore barred his action. Wright appealed.

The Court of Appeals *held*:

1. Pursuant to MCL 600.5805(6) and MCL 600.5838, a plaintiff must filed a legal-malpractice action within two years of the attorney's last day of service to the plaintiff or within six months of when the plaintiff discovered or should have discovered the claim, whichever is later. Generally, an attorney's representation of a client continues until the client or the court relieves the attorney of that obligation. Retention of an alternate attorney effectively terminates the attorney-client relationship.

2. The evidence showed that Wright terminated the attorney-client relationship on December 18, 2003, by (1) hiring other attorneys to handle his patent application, (2) revoking Rinaldo's power of attorney, and (3) on the same day, granting one of his new attorneys a power of attorney to represent him in the patent matter. Rinaldo performed no work on the patent prosecution—the matter for which Wright had retained her—after Wright revoked her power of attorney.

3. Wright needed Rinaldo's testimony in a related lawsuit concerning the patent, and he also wished to postpone the accrual date of his malpractice claim against her so that the malpractice action would not be time-barred. Because of this, Wright concealed

from Rinaldo (1) his dissatisfaction with her performance, (2) his intent to sue her, and (3) the fact that had had replaced her with other attorneys. Nonetheless, Wright's actions show that the attorney-client relationship ended as of December 18, 2003, even though he strategically concealed this information from Rinaldo and never explicitly terminated her services or formally relieved her of her duties.

4. While Rinaldo advised Wright in October 2005 that he needed to file a maintenance fee for his patent, the ministerial task of sending a reminder letter did not extend the date that Wright's claim accrued. An attorney has an ethical duty to serve the client zealously, and follow-up activities attendant to otherwise completed matters of representation do not extend the time of an attorney's service to the client. The trial court did not err by granting the defendants summary disposition because Wright filed his complaint in February 2006, more than two years after he ended his attorney-client relationship with Rinaldo.

Affirmed.

GLEICHER, J., dissenting, disagreed that the statute of limitations barred Wright's action. Under MCL 600.5838(1), Wright's claim accrued when Rinaldo stopped serving him in a professional capacity concerning the patent matter, regardless of whether Wright knew of the existence of a claim against her earlier. Rinaldo stopped her professional service in October 2005 when she first learned that Wright had revoked her power of attorney, not when Wright revoked it. An attorney remains responsible for representing a dissatisfied client until (1) the court relieves the attorney of that obligation, (2) the client fires the attorney, or (3) the attorney gives the client reasonable notice that he or she has terminated the representation. Rinaldo never communicated to Wright an intent to withdraw as his patent counsel, Wright never told Rinaldo that he had fired her, and the director of the patent office never approved Rinaldo's withdrawal, which the rule governing patent matters requires. Although Wright retained an additional attorney, Rinaldo continued to serve as his patent counsel.

1. LIMITATION OF ACTIONS — MALPRACTICE — LEGAL-MALPRACTICE ACTIONS — ATTORNEY AND CLIENT.

A plaintiff must file a legal-malpractice action within two years of the attorney's last day of service to the plaintiff or within six months of when the plaintiff discovered or should have discovered the claim, whichever is later; retention of an alternate attorney effectively terminates the attorney-client relationship (MCL 600.5805[6], 600.5838).

2. ATTORNEY AND CLIENT — REPRESENTATION OF CLIENT — TERMINATION OF LEGAL
    SERVICES — ACCRUAL OF CLAIMS.

An attorney's follow-up activities attendant to otherwise completed
matters of representation, such as the ministerial task of sending
a reminder of a deadline, do not extend the time of the attorney's
service to the client for purposes of determining when a legal-
malpractice claim accrues (MCL 600.5805[6], 600.5838).

*Lawrence J. Acker, P.C.* (by *Lawrence J. Acker*), for
the plaintiff.

*Maddin, Hauser, Wartell, Roth & Heller, P.C.* (by
*Steven M. Wolock* and *Harvey R. Heller*), for the defen-
dants.

Before: SAAD, C.J., and BORRELLO and GLEICHER, JJ.

SAAD, C.J. In Mr. Rickie Wright's legal-malpractice
action against his lawyer, Ms. Amy Rinaldo, the trial
court granted summary disposition to Rinaldo and her
law firm[1] because Wright failed to file his complaint
within the applicable two-year period of limitations. For
the reasons set forth in this opinion, we affirm the trial
court's holding that plaintiff's malpractice claim is
time-barred.

I. NATURE OF THE CASE

Under Michigan's statutory law, a client's claim
against his or her attorney for professional malpractice
accrues on the date that his attorney "discontinues
serving the plaintiff in a professional . . . capacity as to
the matters out of which the claim for malpractice

[1] Rinaldo worked for Kohn & Associates, P.L.L.C., at the time this claim
arose, and Wright sued both Rinaldo and the law firm for Rinaldo's
alleged malpractice. However, for ease of reference, and because Rinal-
do's conduct is at issue, we refer to Rinaldo alone for the remainder of
this opinion.

arose . . . ." MCL 600.5838(1). The client's action for malpractice is time-barred unless it is brought within two years from the date the claim accrued or arose (i.e., the date that services were discontinued), or within six months of the date that "the plaintiff discovers or should have discovered the existence of the claim," whichever date occurs later. MCL 600.5805(6); MCL 600.5838(2); *Kloian v Schwartz,* 272 Mich App 232, 237; 725 NW2d 671 (2006). Here, the client, Wright, unquestionably knew of his lawyer's alleged malpractice before Rinaldo ceased representing him; therefore, the timeliness of Wright's filing of his complaint depends on the date that his attorney discontinued services. Rinaldo says this accrual date is December 18, 2003, when Wright in essence ended the relationship, albeit without formally informing Rinaldo. Rinaldo maintains, and we agree, that Wright effectively terminated the attorney-client relationship on December 18, 2003, when he (1) hired other attorneys to handle his patent application, (2) executed documents revoking her power of attorney, and (3) granted one of his new lawyers power of attorney to represent him in the patent-application process. The evidence also shows that Wright concealed from Rinaldo (1) his dissatisfaction with her performance, (2) his intent to sue her for malpractice, and (3) the fact that he had replaced her with other lawyers, because he needed her testimony in a related lawsuit and also because he wished to postpone the accrual date of his malpractice claim so that his cause of action would not be time-barred.

Accordingly, by virtue of Wright's actions, the attorney-client relationship ended on December 18, 2003, notwithstanding Wright's "strategic concealment" of his conduct from Rinaldo. Wright's malpractice suit was therefore untimely because he delayed

filing it until February 16, 2006, more than two years after the accrual date of December 18, 2003.

## II. FACTS AND PROCEDURAL HISTORY

Beginning in August 2000, Rinaldo represented Wright to prosecute his patent application and amendments for an absorbent "surface protection system mat" and, as counsel, filed various documents with the United States Patent and Trademark Office. During the summer and fall of 2003, Wright became dissatisfied with Rinaldo's work. At the time, Wright was also represented by attorney Michael Nedelman in a bankruptcy matter. Wright also intended to have Nedelman pursue litigation to enforce Wright's patent rights against his former business partner, Wade Waterman, and other companies that were marketing a surface-protection mat that was similar to Wright's invention.

By October 2003, Wright and Nedelman began to consult with another patent attorney, Arnold Weintraub, about the enforceability of Wright's patent, and Wright ultimately directed Weintraub to undertake all the legal work for the patent. To this end, *on December 18, 2003*, Wright met with Nedelman and Weintraub and signed a document issued by the patent office that *revoked Rinaldo's power of attorney*. At the same time, Wright executed a power of attorney for Weintraub and instructed the patent office that all future correspondence should go to Weintraub. The power of attorney authorized Weintraub to prosecute the patent and "to transact all business in the United States Patent and Trademark Office connected therewith." On the same day, Wright also signed an affidavit that Nedelman notarized. It appears that the affidavit was drafted in an effort to remove Waterman's name from Wright's floor-mat patent. In this affidavit, Wright blamed the

error in designating Waterman as a co-inventor on Rinaldo, whom he identified as his *"previous counsel."* Wright also asserted in the affidavit that he had "retained new patent counsel."

The record reflects that, after the revocation, Wright and his attorneys were reluctant to communicate with Rinaldo because they believed that Rinaldo's favorable testimony was critical to Wright's lawsuit against Waterman. Indeed, after Wright obtained the favorable testimony he sought from Rinaldo, Wright ceased all communication with her.

On February 23, 2004, Weintraub filed a "preliminary amendment" with the patent office to add new claims to the description of Wright's floor-mat invention. Weintraub signed the documents and also sent to the patent office the December 18, 2003, documents that granted him power of attorney and revoked Rinaldo's power of attorney. The record reflects that, though no one corresponded with Rinaldo after she signed the affidavit, Wright remained concerned about Rinaldo's continuing role in providing favorable testimony in the litigation against Waterman. However, around the same time, Wright and Nedelman began to consult with attorneys about filing a malpractice action against Rinaldo. Wright also advised Weintraub that Nedelman should participate in the attorney consultations because he needed Rinaldo's testimony before they filed the malpractice action. Wright also expressed concern that the period of limitations for his claim against Rinaldo might expire.

In October 2005, Rinaldo sent Wright a letter to advise him that the maintenance fee for his patent was due on March 10, 2006. Rinaldo testified that, although she did not represent Wright as his attorney at that time, she had calendared his maintenance-fee dates

and, when the date was flagged, she alerted Wright so that she would not be blamed if he allowed the patent to lapse. Rinaldo's letter further stated that, if Wright wanted her or her firm to pay the fee, he would need to pay a retainer fee in advance.[2] Wright ultimately had Weintraub pay the maintenance fee for the patent.

Later, in October 2005, Rinaldo sent another letter to Wright, indicating that she had received correspondence from the patent office that it had disallowed some claims she filed in May 2003. Rinaldo also stated that she had received notice from the patent office that her power of attorney had been revoked, and she asked for information about where to send the file. Wright was upset to learn that Weintraub had submitted the revocation of Rinaldo's power of attorney to the patent office. He wrote to Weintraub and complained that Nedelman and Weintraub had always taken the position that Rinaldo needed to remain the attorney of record with the patent office if they wanted to timely file a legal-malpractice action against her.

Thereafter, Weintraub informed Wright that had he replied to correspondence from the patent office that had been erroneously sent to Rinaldo. Weintraub wrote the following in his response to the patent office:

> Kohn & Associates, Farmington Hills, Michigan prosecuted the above United States Patent 6,446,275 and on May 12, 2003 filed this reissue application. *On December 18, 2003, Applicant (Mr. Rickie Wright) revoked the Power of Attorney to Kohn & Associates and appointed the under-*

---

[2] After he received the letter, Wright wrote to Nedelman and Weintraub and stated:

> What response (if any) should I make to Amy regarding the letter she sent to me.

> She will get suspicious if I do not respond.

*signed (Mr. Arnold S. Weintraub) as his attorney to pros-
ecute all business associated with this matter.*

Wright filed this legal malpractice action against
Rinaldo on February 16, 2006. Specifically, Wright al-
leged that Rinaldo had (1) failed to promptly remove
Waterman from the patent application, (2) improperly
drafted documents submitted to the patent office, and
(3) failed to recognize and take steps to correct the
patent because it did not adequately protect Wright's
invention. The trial court granted Rinaldo's motion for
summary disposition, held that Wright and Rinaldo's
attorney-client relationship ended on December 18,
2003, and, therefore, ruled that Wright's February 2006
complaint was barred under the two-year statute of
limitations.

### III. ANALYSIS[3]

The primary purposes behind statutes of limitations
can be summarized as (1) encouraging the plaintiffs to
diligently pursue claims and (2) protecting the defen-
dants from having to defend against stale and fraudu-
lent claims. *Lemmerman v Fealk,* 449 Mich 56, 65; 534
NW2d 695 (1995). In *Lothian v Detroit,* 414 Mich 160,
166-167; 324 NW2d 9 (1982), our Supreme Court enu-

---

[3] Pursuant to MCR 2.116(C)(7), the trial court granted summary
disposition to defendants because Wright's claim was barred by the
statute of limitations. As this Court explained in *Citizens Ins Co v
Scholz,* 268 Mich App 659, 662; 709 NW2d 164 (2005):

This Court reviews de novo a trial court's grant of summary
disposition under MCR 2.116(C)(7). *Maiden v Rozwood,* 461 Mich
109, 118; 597 NW2d 817 (1999). Summary disposition is properly
granted under MCR 2.116(C)(7) when an action is time-barred. *Id.*
at 118 n 3. *Young v Sellers,* 254 Mich App 447, 449; 657 NW2d 555
(2002). " '[A]bsent disputed questions of fact, whether a cause of
action is barred by a statute of limitations is a question of law that
this Court also reviews de novo.' " *Id.* at 450 (citation omitted).

merated several policy considerations underlying statutory limitations periods, including security against stale demands when circumstances would be unfavorable to a just outcome, the avoidance of inconvenience resulting from delay in asserting legal rights, and penalization of plaintiffs who have not been industrious in pursuing their claims.

Pursuant to MCL 600.5805(6) and MCL 600.5838(2), a plaintiff must file a legal-malpractice action within two years of the attorney's last day of service to the plaintiff or within six months of when the plaintiff discovered or should have discovered the claim, whichever is later.[4] The parties agree that Wright's knowledge of Rinaldo's alleged malpractice clearly preceded the last day of service and that the operative date is the date of Rinaldo's last service as Wright's attorney. The parties disagree about when that occurred.[5] "Generally, when an attorney is retained to represent a client, that representation continues until the attorney is relieved of the obligation by the client or the court." *Mitchell v Dougherty,* 249 Mich App 668, 683; 644 NW2d 391 (2002).[6] Retention of an alternate attorney effectively

[4] *Kloian, supra* at 237.

[5] We agree with Rinaldo that the trial court simply made a clerical error when, at the end of its opinion and order, it stated that "clearly Rinaldo's representation of [Wright] ended when he *filed* a revocation of the power of attorney on December 18, 2003, more than two years before the date the instant Complaint was filed." (Emphasis added.) As is clear from the rest of the trial court's opinion, the court believed that the attorney-client relationship ended when Wright executed the documents that revoked Rinaldo's power of attorney and granted it to Weintraub, not when Weintraub filed the documents with the patent office.

[6] We note that Wright has changed his position with regard to the accrual date. In the trial court, Wright argued that the revocation of Rinaldo's power of attorney was not effective until the patent office officially accepted it in October 2005. Now he argues that the revocation did not occur until Weintraub mailed the revocation to the patent office

terminates the attorney-client relationship. *Kloian, supra* at 237. The dispositive question is when did Wright effectively terminate Rinaldo's representation of him in this patent application.

Rinaldo testified that, at a meeting on November 7, 2003, it was made clear to her by Wright, and Nedelman and Weintraub, that she no longer represented Wright as his patent counsel. Also, significantly, Wright signed the revocation of Rinaldo's power of attorney on December 18, 2003, and, on the same day, he signed another document granting power of attorney to Weintraub. As Weintraub later represented to the patent office, Wright's revocation and Weintraub's appointment both occurred when Wright signed the papers on December 18, 2003. Indeed, from Weintraub's assertions to the patent office, it is clear that he believed that he was acting as Wright's sole patent counsel as of December 18, 2003. On the same date, Wright also signed a notarized affidavit in which he referred to Rinaldo as his former attorney and stated that he had retained new counsel.

Though Wright claims that he intended Weintraub and Rinaldo to act as "co-counsel," his own actions belie this assertion. Wright would have had no reason to revoke Rinaldo's power of attorney if he had intended her to continue representing him along with Weintraub. Rather, Wright substituted Weintraub as his attorney by authorizing Weintraub "to transact all business in the United States Patent and Trademark Office connected" with his floor-mat patent. While Wright claims that mere "consultation" with another attorney does not end an attorney-client relationship, the evidence we

on February 23, 2004. However, the evidence shows that Wright replaced Rinaldo with other counsel, Weintraub, well before the patent office was informed of the change.

have outlined shows that he not only consulted with
Weintraub, but appointed him as his new counsel. And,
though Rinaldo drafted language to correct the patent
or expand its protection in November and December
2003, Wright later had Weintraub file his own changes
with the patent office.

Rinaldo presented further evidence that, as early as
October 28, 2003, Wright directed Weintraub to correct
Rinaldo's alleged mistakes and that, by November 2003,
Nedelman had determined that Rinaldo was "doing
nothing of value" while he and Weintraub were rework-
ing Wright's patent claims. In the November 24, 2003,
e-mail from Wright to Nedelman, Wright asserted that
he would no longer communicate with Rinaldo, and he
directed that Weintraub "take charge" of the patent
prosecution. Indeed, from the time Wright signed the
documents on December 18, 2003, he had Rinaldo
perform no work on the patent prosecution—the very
matter for which he had retained her.

Though Wright maintains that he never explicitly
informed Rinaldo of her termination as his counsel or
formally relieved her of her duties, his actions show
that the attorney-client relationship was, in fact and
law, terminated as of December 18, 2003.[7]

In response to the substantial evidence that Wright
discharged Rinaldo as his attorney by December 18,
2003, Wright takes the position that the rules in the
Manual of Patent Examining Procedure (MPEP) deter-
mine when a claim accrues because the rules define
when an attorney may withdraw from representing a
client in the patent office. According to Wright, the
rules state that a withdrawal or revocation does not

---

[7] *Mitchell, supra* at 684 ("[N]o formal discharge by the client is
required, and the termination of an attorney-client relationship can be
implied by the actions or inactions of the client.").

occur until the patent office approves it. Wright cites no authority to support his claim that MPEP rules take precedence over Michigan law in determining the state-law matter of whether a malpractice action is timely. Wright merely maintains that, because the underlying case involved a patent issue, the patent office's rules should govern. However, as the trial court pointed out, the rules Wright cites only state that the *withdrawal* of patent counsel is effective upon approval by the patent office. The rules do not state that the *revocation* of a power of attorney is only effective when it is approved. Further, as Rinaldo's evidence established, Wright did not merely revoke her power of attorney, he granted the power of attorney to new counsel, Weintraub, and specifically directed him to take over the patent prosecution. Again, a formal discharge is not required to end an attorney-client relationship, particularly when, as here, a client has retained new counsel. *Mitchell, supra* at 682-684.

In an effort to prove an accrual date after December 18, 2003, Wright also presented evidence that, in October 2005, Rinaldo wrote to Wright to advise him that he must file a maintenance fee for his patent. Wright claims that this shows that Rinaldo saw her professional relationship with Wright as ongoing. In response, Rinaldo testified that she had calendared Wright's maintenance-fee schedule when he was a client and that she received notification in October 2005 that the fee was due. She further testified that, although she did not consider herself to be Wright's attorney, she sent the reminder letter so that she would not be blamed if the patent lapsed. Regardless of her reasoning, Rinaldo's ministerial task of sending a reminder letter to Wright did not extend the accrual date. Rather, Rinaldo's notification falls within the category of matters out-

lined in *Bauer v Ferriby & Houston, PC*, 235 Mich App
536, 538-539; 599 NW2d 493 (1999):

> A lawyer has an ethical duty to serve the client zeal-
> ously. See, e.g., *Grievance Administrator v Fried*, 456 Mich
> 234, 242; 570 NW2d 262 (1997); *American Employers' Ins
> Co v Medical Protective Co*, 165 Mich App 657, 660; 419
> NW2d 447 (1988). Some of a lawyer's duties to a client
> survive the termination of the attorney-client relationship,
> most notably the general obligations to keep client confi-
> dences and to refrain from using information obtained in
> the course of representation against the former client's
> interests. See MRPC 1.6 and 1.9 and comments. Sound
> public policy would likewise encourage a conscientious
> lawyer to stand ever prepared to advise a former client of
> changes in the law bearing on the matter of representation,
> to make a former client's file available if the former client
> had need of it, and, indeed, to investigate and attempt to
> remedy any mistake in the earlier representation that
> came to the lawyer's attention. *To hold that such follow-up
> activities attendant to otherwise completed matters of rep-
> resentation necessarily extends the period of service to the
> client would give providers of legal services a powerful
> disincentive to cooperate with a former client who needs
> such attention.* We conclude that the proper inquiry is
> whether the new activity occurs pursuant to a current, as
> opposed to a former, attorney-client relationship. [Empha-
> sis added.]

Rinaldo specifically stated in her letter that, if Wright
wanted her to follow up with the patent maintenance,
he would have to remit a retainer fee. Further, Wright
had vowed not to speak to Rinaldo and, indeed, he did
not speak to her after he signed the revocation on
December 18, 2003. As Rinaldo observes, Wright did not
even know how to respond to her maintenance-fee
letter, but feared that if he did not respond, she would
"get suspicious." This conduct is inconsistent with an
ongoing professional relationship between Wright and
Rinaldo, particularly given that Wright had obtained

different patent counsel, did not permit Rinaldo to work on any further patent matters, and had no communication with her for almost two years.

In sum, Wright's conduct clearly demonstrated that he ended the attorney-client relationship with Rinaldo no later than December 18, 2003, although he did so in a somewhat unorthodox fashion. And, because Wright failed to file his legal-malpractice complaint until February 16, 2006, the trial court correctly ruled that his malpractice claim was barred by the two-year statute of limitations.

Affirmed.

BORRELLO, J., concurred.

GLEICHER, J. (*dissenting*). I respectfully dissent. Under the text of MCL 600.5838(1), plaintiff's legal-malpractice claim accrued when defendant Amy Rinaldo discontinued serving him in a professional capacity "as to the matters out of which the claim for malpractice arose, regardless of the time the plaintiff discovers or otherwise has knowledge of the claim." Rinaldo discontinued serving plaintiff in October 2005, when Rinaldo first learned that plaintiff had revoked her power of attorney to act as his patent counsel. Contrary to the majority's analysis, plaintiff's earlier knowledge of the existence of a claim is neither controlling nor relevant, according to the unambiguous language of the accrual statute. Therefore, plaintiff timely filed this lawsuit on February 16, 2006.

The majority concludes that the cause of action accrued on December 18, 2003, because plaintiff signed documents on that date revoking Rinaldo's power of attorney and referring to her as his "former" counsel. According to the majority, when plaintiff signed these

documents, he "in essence ended the relationship, al-
beit without formally informing Rinaldo." *Ante* at 529.
The majority acknowledges that plaintiff "strategi-
c[ally] conceal[ed]" his intent to discharge Rinaldo and
that Rinaldo had no knowledge of plaintiff's intent to
discharge her until October 2005. *Ante* at 529.

The "matter[] out of which the claim for malpractice
arose" was a defective patent application. The factual
record, in conjunction with the rules governing patent-
law practice, establishes that Rinaldo bore the respon-
sibility to represent plaintiff until his new counsel
successfully filed a revocation of her power of attorney
and Rinaldo learned of that filing. In MCL 600.5838(1),
the Legislature described a purely objective standard
for accrual that triggers the running of the two-year
period of limitations by a discernible event: the discon-
tinuation of services. An attorney does not discontinue
serving a client merely by making a subjective mental
decision to quit. In my view, communication with the
client is an essential element of an attorney's decision
to discontinue representation. Further, I believe that an
unhappy client may elect to continue an attorney's
representation despite dissatisfaction with the attor-
ney's performance or an expressed intent to discharge
the attorney in the future. If the client elects to main-
tain the attorney-client relationship, the attorney re-
mains responsible for the dissatisfied client's represen-
tation until he or she (1) is relieved of that obligation by
the court, (2) is officially fired by the client, or (3) gives
the client reasonable notice that representation has
been terminated. See MRPC 1.16.

### I. THE FACTUAL RECORD

In September 1999, plaintiff, Rickie Wright, and his
business partner, Wade Waterman, filed an initial

patent application for a "Surface Protection System Mat." Plaintiff had drafted the patent application without the assistance of counsel. In June 2000, the United States Patent and Trademark Office (USPTO) rejected the patent application for several reasons, including plaintiff's failure "to define the invention" in the requisite manner and the application's recitation of the claims "in narrative form . . . replete with indefinite and functional or operational language." Plaintiff then retained Rinaldo, a registered patent specialist,[1] to file an amendment of the defective 1999 patent application. Rinaldo commenced her efforts on plaintiff's behalf by filing with the USPTO a power of attorney signed by plaintiff.

The rules of practice before the USPTO are similar to the Michigan Court Rules in several important respects. Under the Michigan Court Rules, an attorney "may appear by an act indicating that the attorney represents a party in the action." MCR 2.117(B)(1). "Act" includes filing "a written appearance . . . ." MCR 2.117(B)(2)(a). The rules governing practice in the USPTO provide that "[a]n applicant for patent may file and prosecute his or her own case, or he or she may give a power of attorney so as to be represented by one or more patent practitioners or joint inventors." 37 CFR 1.31. The power of attorney in a patent case serves exactly the same function as an appearance:

> When a patent practitioner acting in a representative capacity appears in person or signs a paper in practice before the United States Patent and Trademark Office in a patent case, his or her personal appearance or signature

---

[1] Rinaldo testified at her deposition that a registered patent attorney "can prosecute applications before the United States Patent and Trademark Office," which encompasses filing applications, preparing amendments, discussing applications with examiners, and "if need be, do[ing] interference proceedings, appeals before the Board . . . ."

shall constitute a representation to the United States Patent and Trademark Office that under the provisions of this subchapter and the law, he or she is authorized to represent the particular party on whose behalf he or she acts. [37 CFR 1.34.]

On August 29, 2000, Rinaldo filed with the USPTO an amendment of plaintiff's patent. While the amended patent application was pending in the USPTO, a business owned by plaintiff and Waterman (Golden Eagle) marketed and sold the surface-protection mat. In September 2002, the USPTO approved plaintiff's amended patent.

After the USPTO approved the amended patent, plaintiff discovered that a company called St. Clair Plastics "was out there making and selling my invention without my permission . . . ." Plaintiff brought this concern to the attention of both Rinaldo and Golden Eagle's business litigation firm, Maroko & Landau, P.C. Around the same time, plaintiff's relationship with Waterman deteriorated, and Golden Eagle sought bankruptcy protection.

On May 12, 2003, at plaintiff's request, Rinaldo filed a "reissue application" to "correct inventorship" by removing Waterman's name from the patent as a coinventor. This act continued Rinaldo's representation of plaintiff regarding the defective patent. At that point, correction of the patent to remove Waterman's name constituted the matter about which Rinaldo represented plaintiff as his patent counsel.

On July 9, 2003, plaintiff sent Rinaldo an e-mail stating:

> Michael Nedelman is a new lawyer being added to assist Maroko and Landau in my defense of the patent and any offensive action I may need to take. Michael is well known and respected in the courts. Michael is taking a lead role in

the bankruptcy court regarding the termination of my patent license to Golden Eagle as well as other matters. . . .

Would you please give him a brief call or send him an e-mail regarding the patent[?]

According to her billing records, Rinaldo met with plaintiff on July 28, 2003, regarding "litigation," reviewed documents drafted by an attorney concerning "related litigation," and forwarded "comments regarding the same to attorney."

On September 5, 2003, Nedelman wrote to Rinaldo and requested more information about the patent. His letter read: "I need some guidance from you in connection with the anticipated institution of suit against potential infringers upon the patent held by Rickie Wright. Since I have <u>no</u> patent experience, I read the patent as approved by the Patent Office." (Emphasis in original.) Rinaldo e-mailed plaintiff on September 17, 2003, and advised that "we should add a few new claims . . . ." The e-mail continued: "[P]lease let me know how you wish to proceed. I will be out of the office until Monday, but I can begin working on the new claims first thing Monday morning."

Plaintiff, Nedelman, and Rinaldo met on September 23, 2003. On October 14, 2003, Nedelman spoke with another patent attorney, Arnold Weintraub, regarding correction of the inventorship issue. Three days later, Nedelman wrote to Rinaldo to express concern about the progress of the efforts to remove Waterman's name from the patent. Nedelman also criticized "the efficacy" of Rinaldo's attempts to remove Waterman "as an inventor" and expressed concern about the patent itself:

> You have recently admitted that the claims you prepared failed to adequately describe and do not encompass the actual product designed by Rickie Wright, and as being

manufactured and sold. The failure to advance the correct claims, coupled with your earlier misrepresentations to Rickie Wright that the product was protected, has caused Mr. Wright to suffer significant damages including, but not limited to, lost profits/royalties, the legal fees and expenses paid to your firm, and the costs anticipated to be incurred in rectifying your errors and omissions.

The situation must be rectified, and your errors and omissions corrected to the fullest extent possible. Mr. Wright must be compensated for the damages he has suffered and, if your errors and omissions cannot be corrected, for the damages he will continue to suffer. Please immediately advise me of the course of action you intend to take.

When she received this letter, Rinaldo could have communicated to plaintiff and Nedelman her intent to withdraw as plaintiff's counsel in the patent matter. Alternatively, plaintiff could have fired Rinaldo and instructed Weintraub to file a power of attorney with the USPTO. Instead, Rinaldo responded to Nedelman on October 29, 2003, asserting that "the removal of Wade Waterman as an inventor is being handled properly and in accordance with USPTO practices." Rinaldo concluded:

Finally, and most importantly, please be aware that the written opinions you expressed in your letter of October 17, 2003, could be grossly prejudicial to Mr. Wright's position. *In the future, Mr. Wright's interests are best served by telephoning our office to seek clarification of any issues that may be confusing to either you or Mr. Wright.* [Emphasis supplied.]

Rinaldo wrote the following to plaintiff on the same day:

I have responded to Mr. Nedelman's letter of October 17, 2003. Please be aware that the written opinions expressed by Mr. Nedelman in his letter could be grossly

prejudicial to your position. *In the future, your interests are best served by telephoning our office to seek clarification of any issues that may be confusing to either you or Mr. Nedelman.* [Emphasis supplied.]

Rinaldo met with Nedelman, plaintiff, and Weintraub on November 7, 2003, and prepared the following "Memorandum of Understanding" summarizing their discussion:

> At a meeting held Friday, November 7, 2003, it was agreed among all parties present that Nedelman and/or Weintraub will draft, file, serve and prosecute to finality a civil action lawsuit on behalf of Rickie Wright against Wade Waterman.
>
> It was further agreed among all parties present that Rinaldo will draft and file an amendment consistent with the claims presented at the meeting by Weintraub.

Later that month, plaintiff e-mailed Rinaldo to "check in and make sure you, Michael, and Arne [Weintraub] are working toward a correction of the problems we discussed regarding the patent and it's [sic] claims." The e-mail concluded, "Please let me know if you have any questions or if I can help in any way." On November 26, 2003, Rinaldo replied: "The week after we met I sent the correction to Arnie [Weintraub]. I am waiting for him to tell me to file the amendment." On December 3, 2003, Rinaldo e-mailed the proposed amendment to Weintraub, along with a USPTO form entitled "Reissue Application Declaration By The Inventor," which listed Rinaldo and her law firm as plaintiff's counsel after the language "As a named inventor, I hereby appoint the following attorney(s) and/or agents to prosecute this . . . ."

On December 18, 2003, plaintiff signed a document revoking Rinaldo's USPTO power of attorney and executed the affidavit discussed by the majority, which

referred to Rinaldo as his "previous counsel." Despite signing these documents, plaintiff deliberately refrained from instructing Weintraub to file the documents or discharging Rinaldo as his patent counsel. On January 9, 2004, Rinaldo signed an affidavit averring that Waterman had "made no contribution to the invention of the surface protection mat" and had been "inadvertently and erroneously identified as a coinventor" in the patent application. On January 21, 2004, plaintiff sued Waterman in federal court, seeking a declaration that Waterman had no legally cognizable interest in the surface-protection-mat patent.

In February 2004, Weintraub mailed to the USPTO the preliminary patent amendment prepared by Rinaldo, as well as the signed revocation of her power of attorney. The parties agree that, for unknown reasons, the USPTO never acknowledged receiving these documents and did not act on them. According to Weintraub, a patent examiner eventually told him that the February 2004 filings had "fallen into a black hole . . . ." Weintraub resubmitted the materials in September 2005, and the USPTO finally processed them on October 20, 2005.

Meanwhile, however, the amendment submitted by Rinaldo in May 2003 remained pending in the USPTO. On October 17, 2005, the USPTO announced its decision regarding the patent amendment by sending Rinaldo, the attorney of record, an "Office communication concerning this application or proceeding," which informed Rinaldo that the USPTO had rejected "Claim(s) 1-8" of the May 12, 2003, patent reissue application. A clerk at Rinaldo's office wrote on the USPTO transmission document: "Response 11-17-05."

Rinaldo admitted at her deposition that she had never sent plaintiff a communication reflecting her

intent to withdraw as his patent counsel. She additionally conceded that plaintiff had never advised her that he had "fired" her; she merely assumed that he had done so because of the "tone" of their November 7, 2003, meeting with Nedelman and Weintraub. Nor did Rinaldo make any effort to withdraw as plaintiff's patent counsel, pursuant to the clear provision of the patent rules providing: "A registered patent attorney or patent agent who has been given a power of attorney pursuant to [37 CFR 1.32(b)] may withdraw as attorney or agent of record *upon application to and approval by the Director.*" 37 CFR §1.36(b) (emphasis supplied). This rule bears a substantial similarity to MCR 2.117(C)(2), which provides that "[a]n attorney who has entered an appearance may withdraw from the action or be substituted for only on order of the court."

## II. APPLICATION OF THE LAW

The majority's decision to affirm the trial court's grant of summary disposition is premised on its determination that "the attorney-client relationship was, in fact and law, terminated as of December 18, 2003," the date that plaintiff signed the revocation of the power of attorney. *Ante* at 536. According to the majority, plaintiff "ended the attorney-client relationship with Rinaldo no later than December 18, 2003, although he did so in a somewhat unorthodox fashion." *Ante* at 539.

But the determination of when a legal-malpractice action accrues for purposes of the statute of limitations does not depend on a subjective interpretation of when plaintiff "ended" or "terminated" the attorney-client relationship. Rather, MCL 600.5838(1) requires that an analysis of accrual focus on the date that the defendant attorney discontinued serving the plaintiff in a professional capacity, "regardless of the time the plaintiff"

had knowledge of the claim. In *Gebhardt v O'Rourke*, 444 Mich 535; 510 NW2d 900 (1994), our Supreme Court examined the application of MCL 600.5838 in a legal-malpractice case. The Supreme Court observed that the "statute is unambiguous" and held that a "client has up to two years from the time his attorney stops representing him regarding the matter in question to bring a malpractice suit." *Id.* at 541, 544. Rinaldo did not and could not stop representing plaintiff until (1) he fired her, (2) the USPTO received and accepted plaintiff's request to revoke Rinaldo's power of attorney, or (3) she communicated to plaintiff that she had terminated their relationship. None of these events occurred until October 2005.

Citing *Kloian v Schwartz*, 272 Mich App 232, 237; 725 NW2d 671 (2006), the majority holds that plaintiff's "retention of an alternate attorney effectively terminate[d] the attorney-client relationship." *Ante* at 534-535. In my view, this is a patently incorrect conclusion because the alternate attorney plaintiff retained, Weintraub, worked *with* Rinaldo and not in her stead. Rinaldo, Weintraub, and plaintiff met together on November 7, 2003, and Rinaldo subsequently prepared a "Memorandum of Understanding" regarding that meeting that reflected *her* intent and designated assignment within plaintiff's legal team to "draft and file an amendment consistent with the claims presented at the meeting by Weintraub." Despite plaintiff's retention of Weintraub, Rinaldo clearly continued to serve as plaintiff's official patent counsel.

Furthermore, the statement from *Kloian* on which the majority relies in my view qualifies as dictum, unnecessary to that decision and simply incorrect under the plain language of MCL 600.5838. In *Kloian*, the defendant attorneys informed the plaintiff in writing

that the trial court had dismissed the plaintiff's case. In the same writing, the defendant attorneys additionally informed the plaintiff that they would not prosecute an appeal on the plaintiff's behalf. *Id.* at 236. This Court held that

> in the absence of an attorney's dismissal by the court or the client, and in the event that an attorney sends notice of withdrawal as his or her final act of professional service, a legal malpractice claim with respect to a particular matter that has been finally dismissed by order of the trial court accrues at the time affirmative notification of withdrawal is sent. [*Id.* at 238.]

Unlike the defendant attorneys in *Kloian*, Rinaldo did not send plaintiff a "notice of withdrawal" as his patent counsel. The October 2005 transmission to Rinaldo of plaintiff's revocation of her power of attorney constituted the only "affirmative notification" that Rinaldo no longer represented plaintiff before the USPTO. In my view, *Kloian* supports a conclusion that plaintiff's legal-malpractice claim did not accrue until October 2005, when Rinaldo received the affirmative notification that plaintiff had terminated their attorney-client relationship.

Elsewhere in *Kloian*, this Court observed that "an attorney's representation of a client generally continues until the attorney is relieved of that obligation by the client or the court." *Id.* at 237. This Court followed that sentence with a statement that now serves as the linchpin of the majority opinion: " 'Retention of an alternate attorney effectively terminates the attorney-client relationship.' " *Id.*, quoting *Mitchell v Dougherty*, 249 Mich App 668, 683; 644 NW2d 391 (2002). The *Kloian* opinion identified *Maddox v Burlingame*, 205 Mich App 446, 450; 517 NW2d 816 (1994), as the original source of the language "retention of an alternate attorney."

In *Maddox*, however, this Court noted that the reten-
tion of alternate counsel did *not* terminate the attorney-
client relationship or alter the date on which the
plaintiff's legal-malpractice claim accrued:

> Although plaintiffs already had consulted alternative
> counsel in Florida in August 1988, we do not believe that
> this necessarily terminated the attorney-client relationship
> between the instant parties because defendant earlier had
> directed plaintiffs to consult with Florida counsel in order
> to protect fully plaintiffs' interests under Florida law. In
> other words, plaintiffs' Florida counsel was not consulted
> in place of, but in addition to, defendant. [*Id.* at 451.]

In my view, the relationship between Weintraub,
Rinaldo, and plaintiff was directly analogous to that of
the lawyers and parties involved in *Maddox*. Weintraub
and plaintiff deliberately continued Rinaldo as plain-
tiff's official patent counsel and relied on her efforts in
this role to correct the patent. They planned to delay
her discharge until Weintraub officially substituted as
plaintiff's counsel.

The majority clearly believes that plaintiff, Nedel-
man, and Weintraub conducted themselves in an offen-
sive manner. That may be an accurate perception.
Regardless of the negative and derogatory behind-the-
scenes discussions between plaintiff, Nedelman, and
Weintraub regarding Rinaldo, plaintiff intended that
she remain his official patent counsel until Weintraub
officially superseded her. Further, the character of a
client's conduct is not an element of the definition of
accrual under MCL 600.5838.

In my view, the majority has essentially rewritten the
text of that statute in order to punish plaintiff for his
duplicity regarding Rinaldo. From a pure policy per-
spective, it may be appropriate to penalize clients who
behave as plaintiff did and to prohibit "strategic con-

cealment" of an intent to discharge counsel. But the statute simply cannot be read to provide that a legal-malpractice claim accrues when a client decides to fire his or her lawyer or discusses with alternate counsel a plan to replace the current lawyer. Rather, the statute clearly and unambiguously provides that a malpractice claim accrues "at the time [the defendant] discontinues serving the plaintiff in a professional . . . capacity as to the matters out of which the claim for malpractice arose, *regardless of the time the plaintiff discovers or otherwise has knowledge of the claim.*" MCL 600.5838(1) (emphasis supplied). According to the USPTO, Rinaldo continued to represent plaintiff and remained his official patent counsel until October 20, 2005. In the absence of any communications to the contrary, Rinaldo remained responsible for the prosecution of the May 2003 patent reissue application, at least until she learned in October 2005 that plaintiff had revoked her power to act as his patent counsel.

Because plaintiff filed this lawsuit in February 2006, I conclude that it was timely filed and would reverse the trial court's grant of summary disposition.