# STATE OF MICHIGAN

# COURT OF APPEALS

---

KERRY NAGLE and KERRY STEEL, INC.,

Plaintiffs/Counter-Defendants-
Appellants/Cross-Appellees,

v

HERTZ SCHRAM, P.C., and BRADLEY J.
SCHRAM,

Defendants/Counter-Plaintiffs-
Appellees/Cross-Appellants.

UNPUBLISHED
September 17, 2015

No. 320137
Oakland Circuit Court
LC No. 2012-126214-NM

---

KERRY NAGLE and KERRY STEEL, INC.,

Plaintiffs/Counter-Defendants-
Appellants/Cross-Appellees,

v

HERTZ SCHRAM, P.C., and BRADLEY J.
SCHRAM,

Defendants/Counter-Plaintiffs-
Appellees/Cross-Appellants.

No. 320138
Oakland Circuit Court
LC No. 2013-135475-NM

---

Before: RONAYNE KRAUSE, P.J., and GLEICHER and STEPHENS, JJ.

PER CURIAM.

This legal malpractice action arises from defendant Hertz Schram's representation of plaintiffs Kerry Nagle and Kerry Steel, Inc., in two Tennessee lawsuits. Hertz Schram withdrew as counsel in both cases and the matters eventually settled -- but not to Nagle's satisfaction. Nagle and Kerry Steel sued Hertz Schram and attorney Bradley Schram, alleging that defendants negligently failed to pursue discovery that would have yielded more favorable resolutions. Hertz Schram counterclaimed, asserting that Nagle and Kerry Steel owed more than $100,000 in unpaid legal fees and expenses. The circuit court granted summary disposition in Hertz

-1-

Schram's favor in the malpractice case and on the counterclaim, finding that the former was untimely filed and that plaintiffs had raised no legally cognizable defense to the latter.

The circuit court's statute-of-limitations ruling turned on when plaintiffs' legal malpractice cause of action accrued. One marker for accrual is the date an attorney discontinues serving the plaintiff in a professional capacity. Here, defendants continued serving plaintiffs in both cases even after physically transferring the files to Kerry Steel's accountant. This evidence sufficed to defeat Hertz Schram's summary disposition motion. Accordingly we reverse the circuit court and remand for further proceedings regarding the legal malpractice claim. In doing so, we reject Hertz Schram's argument on cross-appeal that the circuit court should have earlier dismissed plaintiffs' malpractice action with prejudice based on their discovery violations, and affirm the lower court's without-prejudice dismissal.

No further proceedings are required regarding the counterclaim, however, as the circuit court correctly rejected plaintiffs' argument that they never entered into a contract with Hertz Schram for the Tennessee representation. We affirm the circuit court's ruling in that regard.

## I. FACTUAL AND PROCEDURAL OVERVIEW

Kerry Nagle owned Kerry Steel, Inc., which is now out of business. Before Kerry Steel closed its doors, it sold a large volume of steel to Unarco Material Handling, Inc., a Tennessee corporation. Unarco claimed the steel was defective. Kerry Steel and Unarco settled this dispute in 2004. Their agreement required Kerry Steel to sell a quantity of steel to Unarco at a discount, and to credit Unarco $4,000,000 against future purchases. Years later, a former president of Unarco revealed that Unarco's misrepresentations had induced this settlement. More litigation followed. In 2007, Hertz Schram, P.C., agreed to represent Nagle and Kerry Steel in two Tennessee lawsuits precipitated by the Unarco disclosure, one in state court and the other in federal district court. Defendant Bradley J. Schram directed Hertz Schram's litigation team.

The relationship between Nagle and Hertz Schram gradually soured, and Nagle stopped paying Hertz Schram's bills. By July 2010, Kerry and Nagle owed Hertz Schram approximately $100,000. Hertz Schram drafted motions to withdraw in the two pending actions, and on July 6, 2010, emailed the draft motions to Nagle. Nagle responded by email: "You are council [sic]. I have no council after you redraw [sic], you are leaving me high and dry because of your inadequacies . . . ." Bradley Schram responded:

> Just before you hung up on me a few minutes ago, you threatened to oppose the motions to withdraw. You can't deny that you owe my firm approximately $100,000 and we have completely different views and strategies on the cases. You refuse to heed my advice and continue to second guess everything that has occurred. Additionally I have warned you about potential personal exposure on the state case. You have threatened to sue my firm and me for ruining your case (that almost makes me laugh in view of your performance in your depositions in February). It is impossible to continue as your counsel under these circumstances.

Hertz Schram officially filed both withdrawal motions in July 2010; the exact dates are irrelevant, as the parties acknowledge that the filings did not start the statute-of-limitations clock. During the same time frame, Nagle consulted with attorney Hugh Howser, who then practiced in Tennessee, regarding substitute representation. Howser reviewed case documents during July and August, and spoke to Nagle several times about the pending Tennessee cases.

The event at the heart of the statute-of-limitations dispute occurred on August 10, 2010, when Thomas Bonk retrieved a copy of Kerry Steel's files from the Hertz Schram office. Bonk is a certified public accountant. He served on Kerry Steel's board of directors until December 2009, when the company was liquidated. At his deposition, Bonk testified that throughout 2010 he was the chief financial officer of NK Steel, another company owned by Nagle. Nagle testified that Bonk was merely NK Steel's accountant, and not its CFO. We present these facts because Bonk's authority to bind Kerry and Nagle constitutes a side issue to which we will return.

Before handing over the files on August 10, 2010, Hertz Schram presented Bonk with a letter captioned, "File transfer of all *Kerry Steel* matters," reciting as follows:

Dear Mr. Bonk:

The firm is writing you to confirm that you have asked for your file in the above-referenced matter to be transferred to the office of Hugh Howser, Jr. at Miller & Martin PLLC in Nashville, TN. To that end, Brad Schram has filed an Order to Withdraw as Counsel in connection with the above-referenced matter, which was entered by the Court August 2010.[1] We at Hertz Schram PC certainly wish you all the best in your continued legal matters regarding your company.

Under these circumstances, the Michigan Rules of Professional Conduct, which govern the legal profession, mandate that the client is the party that determines who will represent it in the future. You have expressed to the firm that you wish to have Hugh Howser, Jr. represent you on the above legal matters. Therefore, please sign the bottom of this letter. This will give Hertz Schram PC the authorization it needs transfer the file.

We are providing you with a final statement for services rendered by Hertz Schram PC, pertaining to the files maintained by our office (file nos. 7610-1 to 7610-18). If you have any questions about the statement, please contact Victor

---

[1] Hertz Schram's motion to withdraw from the state court case was granted on August 9, 2010. The order notes that it was effective on August 2, 2010. According to the federal district court docket entry sheet, attorney James A. Beakes, III entered an appearance on Kerry Steel's behalf on August 16, 2010. The federal district court granted Hertz Schram's withdrawal motion on August 23, 2010, noting in the order that Kerry Steel had "substituted new counsel" in the matter.

Norris, the firm's Managing Shareholder. Payment of the final invoice is to be made directly to Hertz Schram PC. Prompt payment would be appreciated.

Thank you for allowing Brad Schram and Hertz Schram PC to represent you. If we can be of assistance to you or your family in the future, please do not hesitate to contact us.

Under the signature of Hertz Schram's managing partner, the letter included a paragraph headed, "AUTHORIZATION TO TRANSFER CLIENT FILES." The "authorization," which Bonk signed, stated:

The undersigned hereby authorizes Hertz Schram PC to transfer the above-referenced file and any and all retainer fees being held by Hertz Schram PC associated with the above-referenced files to Hugh Howser, Jr. at Miller & Martin PLLC in Nashville, TN, as it is my choice to retain Hugh Howser, Jr. and/or Miller & Martin PLLC in place of Hertz Schram PC to act as my attorney in the above-referenced matter(s).

Despite the file transfer, Hertz Schram continued to perform and bill plaintiffs for professional legal services. Here is the invoice Hertz Schram prepared for Kerry's insurance company regarding the state court proceeding:

RECEIVED by Michigan Court of Appeals Received for Filing Oakland County Clerk 2013 OCT 30 AM 10:34

IN ACCOUNT WITH

# HERTZ SCHRAM PC

A PROFESSIONAL CORPORATION

## ATTORNEYS

TELEPHONE (248) 335-5000
EMPLOYER ID # 38-2408218

SUITE 300
1760 SOUTH TELEGRAPH ROAD
BLOOMFIELD HILLS, MI 48302

August 31, 2010

NATALIE PLUMLEE, ESQ

C/O CHUBB INS
2001 BRYAN ST., STE 3400
DALLAS, TX 75201

Invoice #   7310   00018  121643  BJS
Billed through    08/31/10

| | | |
|---|---|---|
| Balance as of last invoice | $32,797.59 | |
| Payments since last invoice | 0.00 | |
| Balance carried forward | $32,797.59 | |

RE: ER - 195021 UNARCO MATERIAL HANDLING - STATE COURT PROCEEDINGS

PROFESSIONAL SERVICES PERFORMED

| Date | Init | Description | Hours |
|---|---|---|---|
| 08/10/10 | JDS | INVENTORY FILES TO BE TURNED OVER TO TOM BONK/KERRY STEEL | 0.40 hrs |
| 08/17/10 | JDS | RECEIVE AND REVIEW DEPOSITION NOTICES RE: KERRY STEEL AND TOM BONK; FORWARD SAME TO KERRY STEEL AND TOM BONK | 0.20 hrs |
| 08/18/10 | JDS | ORGANIZE DOCUMENTS TO SEND TO KERRY STEEL, KERRY NAGLE AND TOM BONK | 0.20 hrs |
| 08/31/10 | JDS | SEARCH FOR ORDER SETTING TRIAL DATE PER REQUEST BY ATTORNEY BEN DEAN; CORRESPOND WITH BEN DEAN RE: SAME | 0.30 hrs |

Total Professional Services    $258.50

| | | |
|---|---|---|
| BEGINNING TRUST BALANCE | $0.00 | |
| TRUST BALANCE REMAINING | $0.00 | |

BILLING SUMMARY

| | | | | |
|---|---|---|---|---|
| SWEIK, JONATHON D | 1.10 hrs | 235.00 /hr | | 258.50 |

| | |
|---|---|
| TOTAL FEES | $258.50 |
| CHARGES FOR THIS INVOICE | $258.50 |
| BALANCE CARRIED FORWARD | $32,797.59 |
| TRUST APPLIED TO THIS INVOICE | $0.00 |
| TOTAL AMOUNT NOW DUE | $33,056.09 |

And here is the invoice submitted to Bonk reflecting Hertz Schram's "total professional services" in the federal court matter:

-5-

RECEIVED by Michiff Received for Filing Oakland County Clerk 2013 OCT 30 AM 10:34

IN ACCOUNT WITH

# HERTZ SCHRAM PC
A PROFESSIONAL CORPORATION

**ATTORNEYS**

TELEPHONE (248) 335-5000
EMPLOYER ID # 38-2408218

SUITE 300
1760 SOUTH TELEGRAPH ROAD
BLOOMFIELD HILLS, MI 48302

August 31, 2010

KERRY STEEL INC.

ATTN: TOM BONK
31731 NORTHWESTERN HIGHWAY
SUITE 157W
FARMINGTON HILLS, MI 48334

| | | |
|---|---|---|
| Invoice # | 7310 00004 121642 BJS | |
| Billed through | 08/31/10 | |

| | |
|---|---|
| Balance as of last invoice | $77,433.53 |
| Payments since last invoice | 0.00 |
| Balance carried forward | $77,433.53 |

RE: *UNARCO MATERIAL HANDLING, INC.*
PROFESSIONAL SERVICES PERFORMED

| | | | |
|---|---|---|---|
| 08/02/10 | BJS | TRAVEL TO AND ATTEND HEARING IN TENNESSEE | 12.00 hrs |
| 08/09/10 | BJS | TELEPHONE CALL WITH T. BONK; INVENTORY MATERIALS | 1.00 hrs |
| 08/10/10 | BJS | ASSEMBLE AND REVIEW FILES FOR TRANSFER | 1.50 hrs |
| 08/11/10 | BJS | TELEPHONE CALL WITH K. NAGLE RE COHEN DEPOSITION; REVIEW AND TRANSFER FILES | 1.00 hrs |
| 08/12/10 | BJS | FINALIZE KERRY TRANSFER OF FILES | 1.00 hrs |

Total Professional Services                                        $6,765.00

| | |
|---|---|
| BEGINNING TRUST BALANCE | $0.00 |
| TRUST BALANCE REMAINING | $0.00 |

BILLING SUMMARY

| | | | |
|---|---|---|---|
| SCHRAM, BRADLEY J. | 16.50 hrs | 410.00 /hr | 6,765.00 |

| | |
|---|---|
| TOTAL FEES | $6,765.00 |
| CHARGES FOR THIS INVOICE | $6,765.00 |
| BALANCE CARRIED FORWARD | $77,433.53 |
| TRUST APPLIED TO THIS INVOICE | $0.00 |
| TOTAL AMOUNT NOW DUE | $84,198.53 |

We find noteworthy three aspects of these bills. First, the "professional services" summarized on the invoices were performed by attorneys. BJS is Bradley J. Schram, and JDS is Jonathon D. Sweik, a Hertz Schram attorney. Second, the bills reflect services typically performed by attorneys rather than office staff, including "review[ing] deposition notices" and speaking by telephone with the client (Nagle) regarding a witness's deposition notice. Third, all of these activities took place *after* August 10, 2010, when Bonk picked up a copy of the file.

On April 11, 2012, Nagle and Kerry Steel filed this legal malpractice case. The parties agree that this initial filing was accomplished well within the two-year statute of limitations that generally governs legal malpractice suits. During the first 11 months that the case remained pending, the parties fought a number of battles over discovery. In March 2013, the circuit court entered a show cause order compelling Nagle to appear to explain why he "should not be held in civil contempt for failure to comply with Orders of this Court" and why the case should not dismissed. On April 5, 2013, the circuit court dismissed the legal malpractice case without prejudice based on plaintiffs' repeated failures to comply with previous discovery orders.; However, Hertz Schram's counterclaim remained in dispute. Hertz Schram then sought summary disposition on the counterclaim, arguing that plaintiffs owed $153,810.25 in legal fees and costs plus statutory interest. Hertz Schram included within its fee request the two invoices copied above.

On August 6, 2013, plaintiffs refiled their legal malpractice case. Shortly thereafter, Hertz Schram countered with a second motion for summary disposition, contending that the new action was barred by the statute of limitations. In November 2013, the circuit court granted both of Hertz Schram's motions, and plaintiffs now appeal.

## II. THE STATUTE OF LIMITATIONS

We first consider whether the circuit court properly dismissed plaintiffs' suit on statute of limitations grounds. Our analysis of this question begins with a mathematical calculation.

As we have mentioned, a two-year statute of limitations generally applies in legal malpractice actions. Hertz Schram contends that plaintiffs' claim accrued, and the statute of limitations began to run, on August 10, 2010, when Bonk retrieved a copy of Hertz Schram's file and signed the "authorization to transfer client files." Plaintiffs contend that their claim accrued later than that, as Hertz Schram continued to perform professional services on their behalf at least through August 17.

Regardless of which contention is correct, plaintiffs' original lawsuit, filed on April 11, 2012, was timely. Its filing tolled (suspended) the running of the statute of limitations. MCL 600.5856(a). Adopting for the moment Hertz Schram's view that the statute of limitations expired on August 10, 2012, plaintiffs filed their action with 121 days to spare. Thus, plaintiffs had 121 days from the dismissal date (April 5, 2013) in which to refile their case, or until August 4, 2013. August 4, 2013 was a Sunday; the case would have been timely if filed on August 5,

2013. See MCR 1.108. Thus, Hertz Schram insists, plaintiffs' August 6, 2013 filling was untimely.[2]

Plaintiffs counter that their claim did not accrue until Hertz Schram discontinued serving them in a professional capacity, which occurred when the federal district court granted Hertz Schram's motion to withdraw on August 23, 2010. Alternatively, plaintiffs contend, their claim accrued only after Howser confirmed on August 13, 2010, that he would file an appearance in the Tennessee lawsuits.

Plaintiffs argue that Bonk's signature on the "authorization" did not bind Nagle or Kerry Steel, as Bonk no longer worked for the latter and signed the letter only in his "individual" capacity, and not as an "attorney" for Kerry Steel. Because a corporation cannot represent itself, plaintiffs press, Hertz Schram was not relieved of its representation responsibilities until the federal district court signed an order to that effect.

The circuit court rejected plaintiffs' arguments and granted summary disposition in favor of Hertz Schram, finding plaintiffs' claim barred because "the attorney-client relationship ended by August 10, 2010." The court reasoned as follows:

> An attorney-client relationship continues until the attorney's services are terminated by a court or the client. [*Mitchell v Dougherty*,] 249 Mich App 668[; 644 NW2d 391] (2002). A review of the evidence submitted clearly shows that Defendants' legal services were terminated by August 10, 2010, when Plaintiffs' representative picked up Defendants legal files so that they could be transferred to Plaintiffs' new attorney. The letter states that it concerns "File transfer of all Kerry Steel matters", includes an Authorization to Transfer Client Files which was signed by Thomas Bonk and lists the documents that were released. There is no evidence that supports Plaintiffs' argument that Bonk was not its representative when he picked up the files and signed the Authorization.

"We review de novo the circuit court's resolution of defendants' summary disposition motion." *Stephens v Worden Ins Agency, LLC*, 307 Mich App 220, 227; 859 NW2d 723 (2014). Summary disposition under MCR 2.116(C)(7) is appropriate when the undisputed facts establish that the plaintiff's claim is barred under the applicable statute of limitations. *Id.* (quotation marks and citation omitted). Generally, the defendant bears the burden of proving facts that bring the case within the statute of limitations. *Id.* "In reviewing a motion under subrule (C)(7), the circuit court 'must accept the nonmoving party's well-pleaded allegations as true and construe the allegations in the nonmovant's favor.' " *Id.*, quoting *Diehl v Danuloff*, 242 Mich App 120, 123; 618 NW2d 83 (2000).

---

[2] If plaintiffs' claim accrued on August 11, when defendant Schram conducted a telephone call with Nagle, plaintiffs had 122 days in which to file their case, or until August 5, 2013. Under this scenario, their August 6 filing would be untimely. If plaintiffs claim accrued on August 17, when attorney Sweik "review[ed]" deposition notices, or anytime thereafter, the action was timely filed.

The statute of limitations applicable to legal malpractice claims is two years. MCL 600.5805(6). A malpractice claim "accrues at the time that person discontinues serving the plaintiff in a professional or pseudoprofessional capacity as to the matters of which the claim for malpractice arose, regardless of the time the plaintiff discovers or otherwise has knowledge of the claim." MCL 600.5838(1). When construing and applying this statute, we must give effect to the Legislature's intent. *People v Blunt*, 282 Mich App 81, 83; 761 NW2d 427 (2009). We discern that intent by looking first to the words selected by the Legislature to express its objectives. We attribute to those words their ordinary, plain meanings. *Sun Valley Foods Co v Ward*, 460 Mich 230, 236-237; 596 NW2d 119 (1999).

Applying those rules to MCL 600.5838(1), the Supreme Court has held that "[a]ccrual of a malpractice action . . . occurs on the last day of professional service." *Gebhardt v O'Rourke*, 444 Mich 535, 543; 510 NW2d 900 (1994). This Court has further acknowledged that an attorney may discontinue serving a client either when permitted to do so by a court, or when a client terminates the attorney client relationship by retaining substitute counsel. *Wright v Rinaldo*, 279 Mich App 526, 534; 761 NW2d 114 (2008). At dispute on appeal is when "the last day of professional service" occurred in this case.

Hertz Schram contends that it last served plaintiffs on August 10, when Bonk retrieved the file and signed the "authorization." Thereafter, Hertz Schram maintains, it billed only for compensable but "non-legal, ministerial services." According to Hertz Schram's appellate brief, each of the invoice entries subsequent to August 10, 2010, "involved transitioning Nagle and Kerry Steel's representation to their new attorneys." Hertz Schram submitted no affidavits to that effect in the circuit court, however. And the statements in Hertz Schram's brief are directly contradicted by the words on the invoices, which indicate that Hertz Schram billed for "professional services" rather than "transitional" services.

Hertz Schram's fallback position is that by its terms, Bonk's signature on the authorization terminated Hertz Schram's professional services, so the only reasonable inference to be drawn from the invoices is that the work reflected was "ministerial" rather than "professional." But the record before us does not permit that inference. Applying the plain meaning of MCL 600.5838(1), the accrual date corresponds to the date that Hertz Schram discontinued serving plaintiffs in a professional capacity. According to its own invoices, Hertz Schram was still professionally serving plaintiffs as of August 17, 2010, which renders plaintiffs' refiling timely.

In enacting MCL 600.5838(1), the Legislature adopted the "continuous professional representation," or "last treatment" approach, to the accrual of a legal malpractice claim. *Levy v Martin*, 463 Mich 478, 483, 486; 620 NW2d 292 (2001).[3] "The purpose of the continuous representation rule is to avoid disrupting the attorney-client relationship unnecessarily." 3 Mallen & Rhodes, Legal Malpractice (2015 ed), § 23.44, pp 525-526. Triggering accrual on an

---

[3] Unlike *Levy*, this case does not involve whether professional services rendered by Hertz Schram after August 10 involved matters other than those "out of which the claim for malpractice arose." MCL 600.5838(1).

"occurrence" rather than on the "continuous service," Mallen and Rhodes point out, would "illogical[ly] . . . compel[] clients to sue their attorneys though the relationship continues, and there has not been and may never be any injury." *Id.* at 526.

Even when representation has been terminated by one party or the other, "subsequent events can result in continued representation." *Id.*, § 23.47, p 552. Specifically, an attorney may provide legal services in a matter and bill for those services, reigniting the representation. That is precisely what happened in *Maddox v Burlingame*, 205 Mich App 446; 517 NW2d 816 (1994). The attorney in *Maddox* represented the plaintiffs in the 1986 sale of a franchised business. Plaintiffs provided most of the financing for the sale and retained a security interest in the business. After the deal closed, the defendant attorney revised the sale agreement at the plaintiffs' request, as the buyers were behind in their payments. *Id.* at 447. The defendant also advised the plaintiffs to consult with a Florida attorney with regard to other possible remedies. In 1988, the buyers filed for bankruptcy. Plaintiffs' Florida attorney advised them "that they had a problem with their security interest." *Id.* at 448. On August 15, 1988, the plaintiffs contacted the defendant and accused him of legal malpractice. That call prompted the defendant to perform some legal research, for which he billed the plaintiffs. Plaintiffs filed suit on August 14, 1990. *Id.* The circuit court granted summary disposition to the defendant attorney under MCR 2.116(C)(7), finding that the statute of limitations barred the plaintiffs' claim. *Id.* at 448-449. This Court reversed, holding that the attorney's research and billing constituted "continuous representation," as "an attorney's act of sending a bill constitutes an acknowledgement by the attorney that the attorney was performing legal services for the client." *Id.* at 451.

Here, plaintiffs consulted with Howser after Hertz Schram threatened to withdraw from representation. Bonk's signature on the "authorization" signaled to Hertz Schram that plaintiffs had selected Howser to represent them, and that plaintiffs had relieved Hertz Schram of any responsibilities to act as counsel.[4] Indeed, Hertz Schram's letter stated that along with the file, the firm was "providing you with a final statement for our services[.]" Had Hertz Schram performed no further professional services on plaintiffs' behalf, we would agree with Hertz Schram that plaintiffs' legal malpractice claim accrued on August 10, 2010.

Notwithstanding Bonk's signature on the authorization, however, the evidence establishes that Hertz Schram continued to serve plaintiffs in a professional capacity even after August 10, 2010. According to the records created by Hertz Schram, attorney Sweik reviewed deposition notices and organized documents on August 17 and 18, while attorney Schram engaged in a telephone call with Nagle regarding the "Cohen deposition" and reviewed the file on August 11. Hertz Schram denoted these activities as "professional services" and billed for them at the attorneys' regular legal rates. In its counterclaim, Hertz Schram asserted that these

---

[4] Whether Bonk possessed actual or apparent authority to terminate Hertz Schram's representation of Nagle and Kerry Steel (rather than to simply pick up the file) is a question we need not resolve, as a determination would not alter our analysis.

two invoices represented two of the "monthly bills" that remained unpaid.[5]  Because a legal malpractice claim does not accrue until the defendant "discontinues serving the plaintiff in a professional . . . capacity as to the matters out of which the claim for malpractice arose," MCL 600.5838(1), the Legislature plainly intended that the statute of limitations would be tolled during the period an attorney continues to act as counsel, despite a client's consultation with alternative counsel.

Hertz Schram insists that the services for which it billed after August 10 were not really in the nature of "continuous representation," but rather "involved transitioning Nagle and Kerry Steel's representation to their new attorneys."  We do not find these concepts necessarily inconsistent.  The invoices support that the "transitioning" activities were services performed in a professional capacity, for the benefit of plaintiffs.  In carrying out those services, Hertz Schram acted as plaintiffs' fiduciary, and billed accordingly.  In other words, Hertz Schram continued to "serve" plaintiffs professionally, acting as plaintiffs' counsel despite Bonk's signature on the authorization

Hertz Schram posits that the Supreme Court's opinion *Seyburn, Kahn, Ginn, Bess, Deitch & Serlin, PC v Bakshi*, 483 Mich 345; 771 NW2d 411 (2009), compels us to hold that its "follow-up" activities cannot extend the accrual date.  We find Hertz Schram's reliance on *Seyburn* misplaced, as that case did not involve the accrual rule set forth in MCL 600.5838(1).  Rather, in *Seyburn*, the Supreme Court considered "the proper date of accrual in a breach of contract action for the recovery of unpaid legal fees." *Id*. at 348.  The Court pointed out that in a breach-of-contract action, the statute of limitations "generally begins to run on the date that the breach occurs." *Id*. at 358.  "[A] narrow exception exists in the litigation context," the Court explained, where the client breaches its contract with the lawyer "during the course of the attorney's representation." *Id*.  In that circumstance, a law firm's cause of action to recover unpaid legal fees accrues on the date the attorney-client relationship is terminated. *Id*. at 360.  Thus, *Seyburn* does not control the outcome in this case.  And although *Seyburn* involved accrual in a breach of contract context rather than in a legal malpractice action, it supports rather than undermines our opinion.

The client in *Seyburn* stopped paying legal fees in 1992, while his case was pending in the Court of Appeals. *Id*. at 349.  This Court granted attorney Seyburn's motion to withdraw on September 30, 1993.  In October 1993, the client requested his file.  Seyburn sent the file a month later, along with a bill for the time spent during the month of October reviewing it in preparation for providing it to the client.  The bill set forth three October entries, all related to reviewing the client's file "to determine what to keep and what to return[.]" *Id*. at 350-351.  In 1995, the client brought a legal malpractice action against Seyburn, and Seyburn moved for summary disposition based on the statute of limitations.  The trial court ruled that Seyburn did not discontinue representing the client "until October 1993." *Id*. at 351.

---

[5] Hertz Schram's counterclaim further averred that the monthly bills represented "legal services [provided] to Kerry Nagle/Kerry Steel and incurred costs and expenses for the benefit of Kerry Nagle/Kerry Steel."

-11-

When Seyburn filed a complaint seeking unpaid legal fees in 1999, the client argued that the six-year statute of limitations had expired, as it had accrued when he last paid for legal services in November 1992. Seyburn argued that its claim accrued when it copied the file at the client's request in October 1993. *Id.* at 351-352. The Supreme Court held that Seyburn's claim accrued on September 30, 1993, when this Court permitted Seyburn to withdraw, as that was the date that the attorney-client relationship terminated. *Id*. at 360. The Court rejected the client's argument that "the accrual date can be extended beyond the termination of the attorney-client relationship if the attorney performs follow-up or ministerial services for the client, such as copying or returning the client's file." *Id.* The Court held: "[t]he tasks of reviewing, copying, or returning a client's file do not extend the date of accrual beyond the termination date of the attorney-client relationship." *Id*.

We highlight that the history of the *Seyburn* litigation reflects two different accrual analyses governed by two different statutes of limitation. In the legal malpractice action, the statute of limitations began to run in October 1993, when Seyburn conducted activities related to wrapping up its representation, and sent the client a bill for those services. In the breach-of-contract action for unpaid legal fees, the Supreme Court defined the date of accrual as the date that the parties' attorney-client relationship terminated. In this legal malpractice action, we are guided by the accrual formula set forth in MCL 600.5838(1) rather than the accrual rule created by the Supreme Court in *Seyburn*. In the breach-of-contract context, Seyburn's "acts of reviewing, copying, and returning the file to defendant [did] not extend the accrual date . . . past the termination date of the attorney-client relationship." *Id.* at 361. Not so in the legal malpractice case.

Here, Hertz Schram's invoices evidence that it performed professional services on plaintiffs' behalf for several days after Bonk retrieved the file, during the time period before the federal district court ruled on Hertz Schram's withdrawal motion, and before Howser's law firm entered an appearance. These professional services tolled the limitations period. The last date on which the services were preformed represents the accrual date under MCL 600.5838(1). Accordingly, we reverse the circuit court's grant of summary disposition in favor of Hertz Schram in the legal malpractice case, and remand for further proceedings.

## IV. THE BREACH OF CONTRACT COUNTERCLAIM

We next consider plaintiffs' complaint that the circuit court incorrectly granted summary disposition of Hertz Schram's counterclaim for unpaid legal fees. The circuit court based its ruling on a 2007 engagement agreement prepared by Hertz Schram, and signed by Kerry Nagle as "President and CEO" of Kerry Steel. The agreement is slightly more than two pages long, and sets forth 10 separate terms. Plaintiffs contend that the initial paragraph and first term render the agreement inapplicable to the work performed by Hertz Schram in the Tennessee cases because the contract was limited to "non-litigation" matters. Although inartfully drafted, we conclude that the agreement applied to all of the legal work performed by Hertz Schram on plaintiffs' behalf, and therefore affirm the circuit court's summary disposition ruling in Hertz Schram's favor.

The engagement letter provides, in relevant part:

-12-

We are pleased to represent Kerry Steel, Inc. in various matters that you have engaged our firm to handle. This letter sets forth the terms and conditions of our firm's representation in connection with any matters for which Kerry Steel, Inc. seeks our advice.

1. We will furnish legal services to you in connection with all non-litigation matters you request. We will bill each such matter under your general client number but with a separate file number for each such matter.

2. We will invoice you at the prevailing hourly rate for services rendered by our attorneys and other personnel. . . . The hourly rate shall include time spent in consultation, court, drafting of documents, research, telephone calls and other necessary work.

3. An initial retainer fee in the amount of $25,000 shall be paid upon signing this agreement. You agree to pay an additional monthly retainer of $12,500 on the first of the month, commencing March 1, 2007. However, if the balance of monies in our trust account exceeds outstanding invoices and work in progress by $20,000 as of the end of any given month, the retainer will be waived for the following month. In addition, anytime the combined amount of account receivable and work in process collectively (the "AR/WIP amount") exceeds $20,000 (the "credit amount") we would require that you pay us, within ten (10) days, an amount equal to 90% of of [sic] the excess of the AR/WIP amount over the credit amount. This arrangement is intended to offset the effect of dispensing with any retainer in this matter. A time-price differential fee increase of 18% per annum will be assessed on all outstanding balances remaining unpaid in excess of 60 days following the final day of the applicable billing period.

4. We cannot tell you precisely how much time we will have to spend on your files and the total amount of the expenses. However, as we discussed we will prepare a detailed proforma budget detailing our best estimate of the costs and scope of our representation with respect to estate and tax planning services.

5. All costs in connection with the file are your obligation and are to be paid as they are incurred. The costs may include, but are not limited to, recording fees, filing fees, transcript fees, xerox costs and costs involved in hiring accountants, or other experts if necessary. We will confer with you prior to any single expenditure above $500.00 per occurrence or $1,000.000 in aggregate for outside professional work.

* * *

8. If client breaches any term or obligation of engagement agreement, client agrees to immediate termination of all services being rendered subject to the Michigan Rules of Professional Responsibility.

9.  Payment of all fees for services rendered are due and owing Hertz, Schram & Saretsky, P.C. without regard to whether any transaction or "deal" is consummated, closed, or otherwise successful.

10.  Additional financial requirements including an increased retainer may be required by Hertz, Schram & Saretsky, P.C. in the event the scope of its services increases or the firm is engaged to perform legal services on additional matters.

We interpret this contract de novo. *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 172; 848 NW2d 95 (2014). Our goal in so doing is to read the instrument as a whole and to apply its plain language in discerning the parties' intent. *Dobbelaere v Auto-Owners Ins Co*, 275 Mich App 527, 529; 740 NW2d 503 (2007).

Contrary to plaintiffs' assertion, the engagement agreement read as a whole does not apply only to non-litigation matters. Rather, the document commences by stating that Kerry Steel, Inc., has engaged defendant law firm "in various matters." Although the first numbered paragraph refers to "non-litigation matters," paragraph 2 refers to the firm's hourly rate for "time spent in . . . court," and paragraph 5 mentions "transcript fees" and the costs of "experts." And paragraph 10 acknowledges that "the scope of . . . services" might "increase[]" over time. Read as a whole, the agreement applied to all matters in which Hertz Schram provided legal services to Kerry Steel. Furthermore, plaintiffs plainly treated the agreement as controlling, thereby mutually modifying it to encompass the work done on litigation matters.

We also reject plaintiffs' argument that the circuit court erred by failing to hold an evidentiary hearing to determine whether defendants' fees were reasonable, as measured by surveys and consideration of other objective factors. Plaintiffs' reliance on *Schellenberg v Rochester, Mich Lodge No 2225 of the Benevolent & Protective Order of Elks of the United States of America*, 228 Mich App 20, 44; 577 NW2d 163 (1998), is misplaced because that case did not involve a breach-of-contract action for recovery of attorney fees, but an action for violation of the Civil Rights Act (CRA), MCL 37.302, and an award of attorney fees and costs under the CRA. *Id*. at 24, 47-48.

"In resolving disputes between attorney and client regarding the amount of compensation due under a written fee agreement, courts apply general rules of contract construction." *Wistrand v Bese*, 23 Mich App 423, 427; 178 NW2d 826 (1970). The parties' engagement letter does not limit defendants' entitlement to attorney fees to an amount judicially determined to be deemed "reasonable." Therefore, plaintiffs' contention that the trial court was required to hold an evidentiary hearing and apply surveys and other information to determine the reasonableness of defendants' fees lacks merit.

We likewise reject plaintiffs' contention that defendants could not charge a time-price differential because they did not establish the existence of a written contract governing the Tennessee litigation. However, a review of the engagement letter reveals that it expressly provides for a time-price differential in paragraph three, and time-price differential contracts are an exception to the usury statutes, *Corrigan v Insilco Corp*, 176 Mich App 262, 269; 439 NW2d

-14-

350 (1989). Further, MCL 438.31, governing legal interest, does not apply to any time-price differential charged for services on credit. This challenge, too, is without merit.

## V. DISMISSAL WITHOUT PREJUDICE

Lastly, we turn to Hertz Schram's argument on cross-appeal that the circuit court abused its discretion by dismissing plaintiffs' malpractice case without, rather than with, prejudice as a sanction for plaintiffs' discovery violations. We review the circuit court's without-prejudice dismissal for an abuse of discretion. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006). A decision constitutes an abuse of discretion when "it falls outside the range of reasonable and principled outcomes." *Holman v Rasak*, 486 Mich 429, 448 n 10; 785 NW2d 98 (2010).

"The trial court's front-line responsibility for the administration of justice mandates the potential use of sanctions for delay." *North v Dep't of Mental Health*, 427 Mich 659, 661-662; 397 NW2d 793 (1986). The court's authority to impose severe sanctions is necessary to penalize conduct warranting such a sanction and to deter others from engaging in similar conduct. *Id*. at 662. Although the circuit court possesses authority to exercise the most drastic sanction of dismissal with prejudice, this measure "should be exercised cautiously." *MacArthur Patton Christian Ass'n v Farm Bureau Ins Group*, 403 Mich 474, 477; 270 NW2d 101 (1978). The overriding policy in Michigan's legal system favors disposition of the litigation on the merits. *North*, 427 Mich at 662. Consequently, dismissal with prejudice is to be ordered "only in extreme situations." *Id*. (quotation marks and citation omitted).

Plaintiffs'' conduct during discovery deserves no praise. Had the circuit court dismissed this matter with prejudice, we would find no abuse of discretion. The question before us is whether the circuit court's decision to dismiss the matter without prejudice falls outside the range of principled options. We find that it does not, as plaintiffs' discovery violations resulted from a credible concern that disclosure of certain documents would violate a preexisting protective order. Accordingly, the circuit court's employment of a sanction other than dismissal with prejudice served the interests of justice.

We reverse the circuit court's grant of summary disposition of plaintiffs' legal malpractice claim, but affirm summary disposition of Hertz Schram's counterclaim and the circuit court's order dismissing the legal malpractice action without prejudice as a discovery sanction. Because neither party prevailed in full, each shall bear its own appellate costs. See MCR 7.219.

/s/ Amy Ronayne Krause
/s/ Elizabeth L. Gleicher
/s/ Cynthia Diane Stephens

-15-